**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RIYA DAS, on behalf of herself and those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ROWAN UNIVERSITY,<br><br>Defendant. | No. 1:26-cv-06685-CPO-MJS<br><br>**JURY TRIAL DEMANDED** |

# FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiff Riya Das ("Plaintiff"), on behalf of herself and those similarly situated, by and through the undersigned counsel, hereby files this First Amended Class and Collective Action Complaint ("Amended Complaint") against Defendant Rowan University ("Rowan" or "Defendant"), seeking all available relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"), the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-56a, *et seq.* ("NJWHL"), and the New Jersey Wage Payment Law, N.J.S.A. § 34:11-4.1, *et seq.* ("NJWPL").

Pursuant to Fed. R. Civ. P. 15(a)(2), this Complaint is filed with the written consent of Defendant and the Court, and it relates back to the date of the original pleading pursuant to Fed. R. Civ. P. 15(c). The foregoing allegations are made on personal knowledge as to Plaintiff's own conduct and are made on information and

belief as to the acts of others.

## INTRODUCTION

1. Rowan is the fastest-growing public research university in the Northeast, with annual enrollment exceeding 25,000 full-time undergraduate and graduate students each year.

2. This case is about Rowan's failure to pay Community Assistants ("CAs") proper wages for all the work it required them to perform. For years, Rowan has relied on CAs to staff residence halls, enforce state and federal law and University policy, serve as mandated reporters, Title IX responsible employees, and Clery Act Campus Security Authorities, respond to emergencies, and remain on call around the clock—all while providing them just a flat $1,000 annual stipend, free housing, and a meal plan.

3. As set forth in detail below, Rowan's CA role bears none of the hallmarks of the narrow "student residential assistant" carve-out on which some universities have relied to avoid the FLSA. Rowan's own governing documents—its Community Assistant Position Description, its "C.L.I.M.B." Residential Curriculum (the "CLIMB" curriculum), its onboarding materials, and its training and duty schedules—establish that CAs perform continuous, mandatory, closely supervised, and legally significant work that is integral to Rowan's operation of its residence halls, that Rowan controls in granular detail, that carries no academic

credit, and for which Rowan pays a scheduled cash stipend in addition to in-kind benefits.

4. As a result of Defendant's unlawful actions, Plaintiff and those similarly situated are owed minimum and overtime wages.

## JURISDICTION AND VENUE

5. This action was removed to this Court from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. GLO-L-000716-26, pursuant to 28 U.S.C. §§ 1441 and 1446.

6. This Court has original subject matter jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331, as those claims arise under federal law.

7. This Court has supplemental jurisdiction over Plaintiff's New Jersey state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same common nucleus of operative fact as Plaintiff's FLSA claims and form part of the same case or controversy.

8. This Court has personal jurisdiction over Defendant because Defendant is a New Jersey public university that conducts substantial, continuous, and systematic business in New Jersey, including at its principal campus in Glassboro, New Jersey.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred

in Gloucester County, New Jersey, where Defendant's Glassboro campus is located and where Plaintiff performed the work described herein.

## PARTIES

10. Plaintiff is an adult resident of Egg Harbor Township, New Jersey. Plaintiff has been employed by Defendant at its Glassboro campus as a Community Assistant from August 2024 to May 17, 2026. Plaintiff's written consent to be a plaintiff in this action pursuant to 29 U.S.C. § 216(b). *See* Ex. A.

11. Defendant Rowan is a public research university and a body corporate and politic organized under the laws of the State of New Jersey.

12. Defendant and/or Defendant's officers, directors, agents, employees, or representatives committed the unlawful acts alleged in this Amended Complaint while actively engaged in the management of Defendant's business or affairs and with the authorization of Defendant.

13. At all times relevant to this Amended Complaint, Plaintiff and similarly situated workers were "employees" of Defendant and covered by the FLSA.

14. At all times relevant to this Amended Complaint, Plaintiff and similarly situated workers were employees entitled to the protection of New Jersey law. N.J.S.A. §§ 34:11-56a1(h), 34:11-56a4(b)(3).

15. At all times relevant, Defendant was an "employer" covered by the FLSA and New Jersey law. N.J.S.A. § 34:11-56a1(g).

16. Defendant employs Plaintiff and other similarly situated workers in New Jersey.

17. Defendant employs individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206–207.

18. Defendant's annual gross volume of sales made or business done exceeds $500,000.

19. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted in the course and scope of their employment with and for Defendant.

## CLASS AND COLLECTIVE DEFINITIONS

20. Plaintiff brings Counts I–II of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b), as a collective action on behalf of herself and the following similarly situated persons:

> All current and former Community Assistants who worked for Rowan between May 19, 2023 and the present (the "FLSA Collective" or "FLSA Collective Members").

21. Plaintiff brings Counts III-IV of this lawsuit pursuant to Federal Rule of Civil Procedure 23 as a class action on behalf of herself and the following class:

> All current and former Community Assistants who worked for Rowan in New Jersey between May 19, 2020 and the present (the "New Jersey

Class" or "New Jersey Class Members").

22. The FLSA Collective and the New Jersey Class are together referred to as the "Classes," with individual members referred to as "Class Members."

23. Plaintiff reserves the right to redefine the Classes prior to notice, and thereafter, as necessary.

## FACTUAL BACKGROUND

24. Rowan is the fastest-growing public research university in the Northeast with annual enrollment of nearly 25,000 full-time undergraduate and graduate students each year.

25. Undergraduate students may choose to live on or off campus, with approximately 35% of students living in on-campus housing.

26. Each year, Rowan employs approximately 125 Community Assistants to live and work in its student housing facilities.

27. Rowan's own "Community Assistant Position Description 2025–2026 Academic Year" (the "Position Description")—a document Rowan requires every CA to review and which governs the CA's employment—organizes CA duties into four categories: (1) Student Development, (2) Problem-Solving & Critical Thinking, (3) Administrative Responsibilities, and (4) Duty. *See* Ex. B.

28. Under "Student Development," CAs must, among other things, "build meaningful relationships with every resident in the assigned area," "mediate

conflicts between roommates and suitemates," "facilitate 1:1s with each resident in the assigned residential area in line with residential curriculum requirements," and "provide active and passive programs based on staff training expectations and residential curriculum requirements."

29. Under "Problem-Solving & Critical Thinking," the Position Description requires each CA to serve, as a condition of the job, as: (a) a Mandated Reporter for the protection of minors under N.J. Rev. Stat. § 9:6-8.10; (b) a "Responsible Employee" for reporting Title IX sexual harassment, sexual assault, and sexual misconduct; and (c) a Campus Security Authority for reporting certain crimes under the federal Clery Act. CAs must also "know University policies," "report information regarding crimes," "abide by the Federal Education Rights and Privacy Act (FERPA)," "address and document suspected/alleged violations of University policies and refer violations to supervisors and/or police as appropriate," and "deliver sensitive letters to students related to student disciplinary proceedings."

30. The Position Description further requires CAs to "promote residents' awareness of their surroundings and safety procedures," "accurately and thoroughly document known incidents of concern," "assist with emergency preparedness programs, including fire drills," and "remain available in/near the residence to assist and support staff, EMTs, Public Safety/Police, and Fire personnel during emergencies unless otherwise directed."

31. Under "Duty," CAs must "participate in CA duty rotation as assigned, completing assigned nightly rounds and providing lock-out, emergency, and other assistance to residents between 8 pm – 7 am," must "accurately and thoroughly complete duty logs," and must "assume responsibility for duty phone, keys, tools, rosters, and other items." The Position Description states that "all residential buildings must have duty coverage each night including during recess periods when other University offices may be closed. This responsibility includes, but is not limited to, Thanksgiving, winter break, and spring break," and CAs are told that they "are required to be on duty during break periods."

32. Under "Administrative Responsibilities," CAs must "be present during move-in days each semester," "remain on campus until the end of closing," "complete room condition reports and inventories," "distribute and collect room keys," "report maintenance and housekeeping problems," "check RLUH mailbox and student email daily," "complete appropriate reports and paperwork promptly including, but not limited to: incident reports, weekly reports, duty logs, resident 1:1 spreadsheets, room condition reports, work orders, staff evaluations," and "conduct room condition checks before opening."

33. Rowan's Position Description expressly requires each CA to sleep in her assigned room every night of the academic year, stating: "[t]he CA position is live-in, and as such CAs are expected to sleep in their assigned room/suite/apartment

each night, except for time away approved in advance by the Community Director."

34. Rowan's Position Description restricts CAs' outside activities, stating that it is "strongly recommended" that CAs "limit their extracurricular activities and/or any other employment opportunities," and requiring that "any staff member wishing to pursue other employment in addition to working for RLUH must receive written approval from their supervisor before beginning additional employment." For example, CAs who wish to pledge a Greek organization must first discuss that intent with their supervisor.

35. The Position Description directs that "students may work no more than 20 hours per week while classes are in session," yet in the same document states that "the Community Assistant position is recognized as a 10-hour per week, part-time stipend position by Human Resources and Payroll"—while separately requiring approximately one duty night per week consisting of at least two hours stationed at a residential front office beginning at approximately 8:00 p.m., followed by additional rounds, followed by remaining "continuously on call overnight until at least 8 am," in addition to "up to 5 weekly hours of job responsibilities between the hours of 8 am & 8 pm."

36. Rowan supplements the Position Description with an extensive CLIMB Curriculum, *see* Ex. C, a 63-page manual that dictates, on a month-by-month and often week-by-week basis, dozens of mandatory deliverables that CAs must

complete under specific deadlines and formatting requirements throughout the entire academic year, including: a welcome email to every resident by a specific date and time; creation and moderation of a "Hall GroupMe" with a specific pinned disclaimer and specific duty-phone information; "No Show"/bed-verification checks of every resident during specific one-week windows each semester; two mandatory Community Meetings per semester, plus separate mandatory Winter and Spring Closing Meetings, each following a Rowan-scripted agenda covering fire safety, guest policy, alcohol and drug policy, vandalism, and quiet hours; a mandatory "Welcome Home" program shift; a "CLIMB Portfolio" documenting the CA's work each semester, to be reviewed with the Community Director and used in both the CA's rehire process and performance evaluation; a nightly duty log submitted for every duty shift; bi-weekly one-on-one meetings with a supervisor; a twice-yearly performance evaluation; weekly staff meetings; and mandatory in-service trainings on specific Friday afternoons throughout the year.

37. Rowan's CLIMB Curriculum and CA Onboarding Checklist further require CAs to attend a mandatory, in-person, multi-week training period before each semester—including approximately three weeks in August before the fall semester and approximately one week in January before the spring semester—and state, without qualification, that "no exceptions can be made for any travel, vacations, family events, etc." and that "failure to attend training may result in

termination."

38. For example, Rowan's CA Training Schedule for the training period preceding the 2025–2026 academic year confirms that training days routinely ran from 8:00 a.m. to 5:00 p.m., 6:00 p.m., or later, with some days—such as August 12, 2025 (8:00 a.m. breakfast through a 5:00 p.m. to 7:00 p.m. Welcome BBQ) and August 19, 2025 (8:00 a.m. breakfast through a 6:00 p.m. to 10:00 p.m. Staff Social)—extending to twelve or fourteen hours, and that CAs were required to remain on campus and engaged in scheduled University activities essentially every waking hour of the training period.

39. Rowan's Onboarding Checklist confirms that CAs must remain on campus through the end of each closing period, including remaining through approximately December 21 for winter closing and through approximately May 18 for summer closing, and that "ALL DUTY days must be covered by in-hall staff" over winter and spring breaks. *See* Ex. D.

40. Rowan's Fall 2025 Move-In Weekend shift schedules assigned CAs, including Plaintiff, to specific multi-hour shifts on specific dates, tracked by name, location, and lunch break, during the move-in period. For example, Rowan's own move-in schedule reflects that Plaintiff worked an 8:00 a.m. to 4:00 p.m. shift at "114/114" on August 25, 2025 (with a lunch break from 12:30 to 1:00 p.m.), and a 12:00 p.m. to 8:00 p.m. shift at "Magnolia/Magnolia" on September 1, 2025—each

shift scheduled, assigned, and tracked directly by Rowan. Ex. E.

41. As a Community Assistant, Plaintiff would, among other responsibilities, complete assigned duty shifts which consisted of answering phones, responding to calls, helping students with questions, completing rounds and monitoring the building, mediating roommate conflicts, helping residents with lockouts, and addressing maintenance issues. Plaintiff observed other Class Members performing similar duties.

42. Prior to the commencement of each school year, Community Assistants participate in a mandatory, multi-week orientation and training program during which they receive training on their duties as a Community Assistant.

43. Defendant scheduled the trainings to run from approximately 8:00 a.m. to 5:00 p.m. or later each day. After trainings concluded each day, Community Assistants were expected to complete additional work until approximately 7:00 p.m. or later in their assigned resident buildings, including creating bulletin boards and door decorations for incoming student residents.

44. Plaintiff estimates that during training, she and other Community Assistants worked in excess of fifty (50) hours each week of training.

45. In practice, Plaintiff's hours varied but she would typically work between ten (10) and twenty (20) or more hours per week, in addition to the duty, training, move-in/move-out, and CLIMB Curriculum obligations described above.

46. Plaintiff observed other Class Members working similar schedules.

47. Plaintiff also occasionally worked over forty (40) hours in a workweek during training, move-in/out, and at other times due to the needs of her position and being on-duty for extended periods of time, including the move-in weekend shifts and multi-week training schedule.

48. Other Community Assistants worked similar hours during training and throughout the semester.

49. Defendant provided Community Assistants, including Plaintiff, remuneration in the form of a free room, a 14-meal plan during the academic term, and an annual stipend of $1,000, which was paid in bi-weekly installments of $50.

50. Rowan's compensation is not merely a "reduced" room or board charge; it is a documented, scheduled cash stipend, paid through Rowan's Human Resources and Payroll systems on a bi-weekly basis pursuant to a written Position Description and offer letter that specifies the amount, timing, and conditions of payment in advance of the work being performed.

51. In the year 2025-2026, when Community Assistants worked over school breaks (winter or spring), Defendant paid them $45.00 for covering 3 or more residence halls per night during winter break. In previous years, it was $30 per night for covering one residence hall.

52. Defendant's $50 bi-weekly stipend payments, and $45 break-duty day-

rate payments, do not satisfy Defendant's minimum and overtime wage obligations to Plaintiff and other Community Assistants.

**Community Assistants Are Rowan Employees**

53. Community Assistants are employees of Rowan.

54. In the Third Circuit, to determine whether an individual is an "employee" under the FLSA, courts analyze the economic realities of the whole relationship, considering whether the individual: (a) performs services for another party, (b) necessarily and primarily for the other party's benefit, (c) under that party's control or right of control, and (d) in return for "express" or "implied" compensation or "in-kind benefits." *See Johnson v. Nat'l Collegiate Athletic Ass'n*, 108 F.4th 163, 180 (3d Cir. 2024); *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

55. As demonstrated below, the specific, granular facts of the Community Assistant relationship—drawn directly from Rowan's own Position Description, CLIMB Curriculum, onboarding materials, training schedule, and shift rosters—provide more than enough factual detail to permit that analysis and to plausibly establish employee status.

56. Community Assistants apply and interview for their positions prior to being hired to work at Rowan.

57. Upon being offered a position, Community Assistants are provided the

Position Description, which lays out the specific terms of their employment, and are asked to complete a Community Assistant Acceptance Form to accept their position within days, on penalty of the offer being rescinded.

58. Defendant unilaterally assigns Community Assistants to live and work in one of Defendant's student housing buildings, and that assignment "is subject to change at any time, up to and including the start of the Fall semester," at Rowan's sole discretion.

59. Defendant provides mandatory, multi-week training to Community Assistants specifying exactly how Defendant expects them to perform the core functions of their position, down to the format of a GroupMe disclaimer message, the content of a welcome email, and the specific script for a "HEART Model" resident conversation.

60. Defendant requires that Community Assistants adhere to all residence hall policies, university policies, and state and federal laws, and further requires that Community Assistants communicate and enforce those policies to students in residence halls, including specific policies on guests, fire safety, smoking, prohibited items, alcohol and drugs, and quiet hours that Rowan scripts for CAs to recite at Community Meetings.

61. Community Assistants who violate Defendant's policies—regardless of whether they are on or off campus, or on or off duty—are subject to discipline up

to and including termination.

62. Defendant sets specific schedules for Community Assistants' training, staff meetings, bi-weekly supervisor 1:1s, in-services, duty shifts, move-in and move-out shifts, and health and safety inspections, down to the specific hour, as reflected in Rowan's own training schedule, move-in shift rosters, and room-inspection schedules.

63. Defendant places restrictions on Community Assistants' personal time, including requiring advance Community Director approval for any night away from the assigned residence, and restricting CAs' ability to travel off campus during mandatory training, move-in, and closing periods.

64. Defendant requires Community Assistants to be readily available for students in their residence halls and to maintain open lines of communication, including through a duty phone that CAs must "assume responsibility" for and pass on to other staff "in good condition."

65. Community Assistants are expected to sleep in their assigned room each night, except for time away, which must be approved in advance by the Community Director.

66. Community Assistants report to and are supervised by Community Directors, who are W-2 employees employed by the University on a full-time basis.

67. Community Assistants regularly meet with their supervisors—on a bi-

weekly basis at minimum—to ensure that Community Assistants are fulfilling their job duties and meeting the deadlines imposed by the CLIMB Curriculum and set by Community Directors, and are formally evaluated against a numeric performance scale twice per year, with that evaluation used in the University's rehire and placement decisions.

68. This degree of control over schedule, script, location, personal time, outside activities, and discipline is characteristic of an employment relationship, not of a student's voluntary participation in an educational program.

69. Community Assistants receive a fixed $1,000 annual stipend and fixed in-kind benefits regardless of the quality, creativity, or managerial skill they bring to their bulletin boards, programs, or resident engagement.

70. A Community Assistant's compensation does not increase based on the number of residents served, the success of her programs, or any other measure of individual entrepreneurial or managerial effort; it is set entirely by Rowan's Position Description and offer letter.

71. Community Assistants make no capital investment in tools, equipment, or materials used to perform their duties. To the contrary, Rowan supplies duty phones, master keys, and program and bulletin-board supplies through its "Leadership Suite," and directs CAs to return any unused, University-purchased supplies.

72. To obtain materials for hall programs, Community Assistants would have to find their own transportation to purchase materials or be required to walk to the nearest stores. Community Assistants would receive poor performance evaluations if the quality of the programs were poor due to a lack of transportation to purchase materials.

73. The Community Assistant position does not require any pre-existing professional license, certification, or specialized skill.

74. Rather, Rowan trains every incoming Community Assistant, over a mandatory multi-week period, in the entirety of the skills the position requires—from GroupMe administration to health-and-safety inspection protocol to HEART Model conversation scripts—through Rowan's own standardized curriculum.

75. The duties and responsibilities of Community Assistants are not part of the academic curriculum at Rowan, and Community Assistants do not receive academic credit for performing their work.

76. Rowan's Position Description requires that CAs "be able to perform all responsibilities and functions of the position for the full academic year (both fall and spring semesters)."

77. CAs who accept a position must reside in their assigned residence hall for the entire academic year as a condition of the position, and remain subject to ongoing conduct and GPA eligibility requirements "throughout the term of

appointment."

78. CAs are discouraged from taking on other employment and must obtain written supervisor approval before doing so, further reflecting the exclusivity and permanence Rowan expects of the relationship.

79. This year-long, exclusive, live-in commitment is far more indicative of an ongoing employment relationship than of a transient or incidental student activity.

80. Community Assistants perform supervisory, security, administrative, community-building, and conflict-mediation services for Defendant.

81. Community Assistants' work primarily and necessarily benefits Defendant.

82. Community Assistants' performance of security and duty-coverage functions—including mandatory nightly rounds, lockout assistance, and the requirement that "all residential buildings must have duty coverage each night including during recess periods,"—relieves Rowan of the responsibility of employing others to perform this function, which is essential to the safe and orderly operation of the university and its residence halls.

83. Community Assistants also serve, as an express condition of the position, as Mandated Reporters, Title IX Responsible Employees, and Clery Act Campus Security Authorities. These are statutory and regulatory compliance roles that are core to the University's own legal obligations, not incidental student

activities.

84. Community Assistants' organization of community activities promotes good student morale, which is essential to the harmonious operation of the university.

85. Additionally, the peer counseling services Community Assistants provide to students in residence halls in connection with minor problems, roommate disagreements, academic struggles, and other mental health issues reduce the demands made upon the university's professional counselors and provide students with an immediately accessible resource person who can offer help and guidance or referrals to other campus resources. This function is not only important to the students but primarily benefits the university in meeting its responsibilities to students.

86. Community Assistants also serve as the first point of contact for facilities issues and emergencies that arise in the residence halls, which benefits the university by efficiently resolving or triaging issues for its resident student population.

87. Lastly, Community Assistants complete a multitude of administrative tasks that primarily benefit the university, including, but not limited to, enforcing residence life and university policies in residence halls, assisting with fire drills and health and safety checks twice a semester, assisting students with lockouts and

maintenance issues, and completing paperwork for resident move-in and move-out each semester.

88. The duties and responsibilities of Community Assistants are not part of the academic curriculum at Rowan and Community Assistants do not receive academic credit for performing their work.

89. Community Assistants perform their work under Defendant's direction and control.

90. Moreover, under the analogous National Labor Relations Act ("NLRA"), the National Labor Relations Board ("NLRB") has repeatedly held—applying its own similar multifactor economic-realities analysis, and not as a matter of collective-bargaining preclusion or exhaustion—that residential student staff are employees of the university employer after finding that they: (1) perform services for their university; (2) receive compensation from universities in the form of free housing and meal benefits; and (3) are subject to the university's control and direction consistent with an employment relationship. *See, e.g.*, Ex. F, *Trustees of the Univ. of Penn. v. Office & Pro. Emps. Int'l Union Local 153*, No. 04-RC-313979 (NLRB Aug. 21, 2023); *see also*, Ex. G, *The George Washington Univ. v. Serv. Emps. Int'l Union Local 500*, No. 05-RC-188871 (NLRB Apr. 21, 2017). Plaintiff cites these decisions solely for their persuasive economic-realities analysis, which parallels the FLSA's own multifactor test; Plaintiff does not contend that the FLSA

claims asserted here are governed, precluded, or subject to exhaustion under the NLRA or any collective-bargaining process. *See Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 728, 745 (1981) (FLSA rights are independent of the collective-bargaining process).

91. Rowan's own Position Description states, in Rowan's own words, that "the duties and responsibilities of Community Assistants are not part of the academic curriculum at Rowan and Community Assistants do not receive academic credit for performing their work."

92. The CLIMB curriculum also includes a references to its "practice of employing students" in its mission statement, refers to its offer letter as "offer of employment" and its corresponding "dates of employment." Ex. C at 3, Ex. H (2025-2026 Offer Letter).

93. For all the foregoing reasons, the Community Assistant role is therefore not part of a "bona fide educational program" within the meaning of the Department of Labor's Fact Sheet #17S.

94. Community Assistants also do not receive merely "reduced" room or board charges or "tuition credits." Rowan provides Community Assistants with fully free housing, a full 14-meal weekly meal plan, and, separately, a documented cash stipend disbursed on a bi-weekly payroll cycle, together with a day-rate cash payment for break duty. This a compensation structure is materially different from,

and more extensive than, the "reduced charges" contemplated by Fact Sheet #17S.

95. To the extent the NJWHL permits an employer to credit "the fair value of any food or lodging supplied by an employer" against its wage obligations, N.J.S.A. § 34:11-56a1(d), that credit is not self-executing: the employer must compute the fair value in the specific manner prescribed by regulation and satisfy applicable notice and recordkeeping requirements before any credit may be taken. See N.J.A.C. § 12:56-8.6 (computation of fair value); N.J.A.C. § 12:56-8.8 (examples).

96. Defendant did not provide Plaintiff or other Class Members advance written notice that the value of housing or meals would be credited against any wage obligation, and has not alleged—nor could it, on the facts pled—that it computed the fair value of those benefits in the manner N.J.A.C. § 12:56-8.6 requires.

97. Nor does Defendant track all hours Community Assistants actually work, making it impossible to determine whether any such credit would satisfy Defendant's minimum wage obligations for all hours worked even if otherwise available and properly computed.

98. Rowan's $50 bi-weekly stipend and $45 break-duty day-rate are themselves direct, scheduled cash wages (not merely in-kind benefits) that Rowan promised in a written Position Description and offer letter in advance of the work being performed, and that Rowan in fact paid through its Human Resources and

Payroll systems.

**Defendant Fails to Pay Minimum and Overtime Wages**

99. Defendant maintains a policy and practice of failing to pay Plaintiff and other Class Members minimum and overtime wages required under the FLSA and New Jersey law.

100. Plaintiff's hours varied but she would typically work between ten (10) and twenty (20) or more hours per week, exclusive of training, move-in/move-out, and CLIMB Curriculum deadline periods described above.

101. Plaintiff observed other Class Members work similar schedules.

102. Plaintiff also occasionally worked over forty (40) hours in a workweek during training, move-in/out, and at other times due to the needs of her position and being on-duty for extended periods of time, as reflected in Rowan's own training schedule and shift rosters.

103. Upon information and belief, other Community Assistants worked similar hours during training and throughout the semester.

104. Despite working such hours, Defendant does not pay Plaintiff and other Class Members full minimum wages for all hours worked.

105. Defendant does not track all the hours that Plaintiff and other Class Members work in their roles as Community Assistants, notwithstanding that Rowan's own schedules—including the move-in shift rosters and room-inspection

schedules described above—demonstrate that Rowan is fully capable of, and does, schedule and track CAs' work to the specific hour when it chooses to do so.

106. Defendant's bi-weekly $50 stipend, and its $45 break-duty day-rate, do not satisfy Defendant's minimum wage obligations to Plaintiff and other Class Members.

107. In workweeks in which Plaintiff and other Class Members worked in excess of forty (40) hours, Defendant did not pay Plaintiff or other Class Members overtime wages at one and one-half times their regular rates of pay for hours worked over forty in a week.

108. Defendant's unlawful practice of refusing to pay Plaintiff or other Class Members full minimum wages and overtime compensation due does not comply with the minimum or overtime wage requirements under the FLSA or New Jersey law.

**Defendant's Failure to Pay Wages is Willful**

109. Defendant's actions in violation of the FLSA, NJWHL, and NJWPL were or are made willfully in an effort to avoid liability under the FLSA and New Jersey wage laws.

110. Rowan's own Position Description simultaneously (a) classifies the Community Assistant role as "a 10-hour per week, part-time stipend position by Human Resources and Payroll," and (b) mandates, in the very same document, a

duty rotation requiring at least two hours stationed at a front office beginning at 8:00 p.m., additional nightly rounds, remaining continuously on call overnight until at least 8:00 a.m., up to five additional weekly hours between 8:00 a.m. and 8:00 p.m., a multi-week mandatory training period, and continuous presence through move-in and closing periods. Rowan's own governing document thus reflects, on its face, actual knowledge of a facial mismatch between its 10-hour wage classification and the substantially greater number of hours it simultaneously requires CAs to work — a mismatch Rowan created and has never corrected.

111. Defendant is a large, sophisticated public employer that has, and has the means to retain, competent counsel to advise it of its legal obligations, and Rowan's own Position Description expressly discusses federal wage-and-hour classifications, reflecting Defendant's awareness of the issue, yet Defendant has never conducted, or at least never acted upon, a wage-and-hour audit or job-classification review of the Community Assistant position to reconcile that mismatch.

112. Defendant is fully capable of scheduling and tracking Community Assistants' work to the specific hour, as shown by Rowan's own training schedule, move-in shift rosters, and paired room-inspection, yet Defendant has chosen not to track all hours Community Assistants actually work for wage-payment purposes. The choice to schedule and log CA time in granular detail for operational purposes

while declining to do so for wage-and-hour compliance supports an inference of reckless disregard rather than good-faith miscalculation.

113. Even though the FLSA requires minimum wage for all hours worked and overtime premium compensation for all hours worked over forty (40) hours per week, Defendant did not pay Plaintiff and Class Members minimum wages for all hours worked or overtime wages for all overtime hours worked.

114. Defendant knew, or absent its own recklessness should have known, that Plaintiff and Class Members were entitled to minimum wages and overtime premiums because they do not qualify for any exemptions under the FLSA or New Jersey law.

115. Defendant could have paid Plaintiff and Class Members minimum and overtime wages but chose not to.

116. By failing to pay all minimum and overtime wages owed to Plaintiff and Class Members, Defendant acted willfully and with reckless disregard of clearly applicable FLSA, NJWHL, and NJWPL provisions.

117. Defendant has not made good-faith efforts to comply with the FLSA, NJWHL, and NJWPL.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

118. Plaintiff brings this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of herself and the FLSA Collective Members as defined

above.

119. Plaintiff desires to pursue her FLSA claims on behalf of all individuals who opt in to this action pursuant to 29 U.S.C. § 216(b).

120. Plaintiff and the FLSA Collective Members are "similarly situated" as that term is used in 29 U.S.C. § 216(b) because, *inter alia*, all such individuals currently work or have worked pursuant to Defendant's previously described common business and compensation practices, and, as a result of those uniform practices, have not been properly paid minimum or overtime wages for all hours worked during the relevant time period. Resolution of this action requires inquiry into common facts, including Defendant's common timekeeping, compensation, classification, and payroll practices applicable to the employees at issue.

121. The FLSA Collective Members are known to Defendant, are readily identifiable, and can easily be located through Defendant's business and human resources records and electronic systems.

122. Defendant employs hundreds of FLSA Collective Members over the relevant period. These similarly situated employees, consisting of both current and former Community Assistants employed by Defendant during the relevant three-year statute of limitations period, should promptly be notified in writing of this action through U.S. mail, email, and text message and/or other means, and allowed to opt in to this action pursuant to 29 U.S.C. § 216(b), for the purpose of collectively

adjudicating their claims for unpaid wages, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## CLASS ACTION ALLEGATIONS

123. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

124. Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiff brings her claims for relief to redress Defendant's violations of the NJWHL and NJWPL on behalf of herself and those similarly situated.

125. Specifically, Plaintiff brings this action on behalf of the New Jersey Class Members, as defined above.

126. Plaintiff and all New Jersey Class Members are similarly situated and are all subject to Defendant's unlawful policies and practices described herein.

127. Numerosity (Fed. R. Civ. P. 23(a)(1)): The New Jersey Class is so numerous that joinder of all New Jersey Class Members is impracticable. Upon information and belief, there are at least forty (40) members of the New Jersey Class.

128. Commonality (Fed. R. Civ. P. 23(a)(2)): There are common questions of law and fact that affect the rights of every New Jersey Class Member, and the types of relief sought are common to every New Jersey Class Member. The same conduct by Defendant, arising from the same uniform, written Position Description and CLIMB Curriculum applicable to all Class Members, has injured each respective

New Jersey Class Member. Questions of law and/or fact common to the New Jersey Class include, but are not limited to:

a. Whether Community Assistants are "employees" of Rowan under the NJWHL and NJWPL;

b. Whether Defendant failed to pay New Jersey Class Members minimum wages for their hours worked;

c. Whether Defendant failed to pay New Jersey Class Members overtime wages for their hours worked over forty (40) hours in a week;

d. Whether Defendant required New Jersey Class Members to work more than forty (40) hours per week; and

e. Whether New Jersey Class Members were not paid lawful wages, including overtime wages, as required by the NJWHL and NJWPL.

129. These questions of law and/or fact are common to the New Jersey Class and predominate over any questions affecting only individual New Jersey Class Members.

130. The claims of Plaintiff are typical of the claims of the New Jersey Class in that all claims are based upon the same factual and legal theories and the same uniform Rowan policies described herein. It is the same conduct by Defendant that has injured each New Jersey Class Member.

131. Plaintiff will fairly and adequately represent and protect the interests of

the New Jersey Class. Plaintiff will fairly and adequately protect the interests of the those similarly situated because Plaintiff's interests coincide with, and are not antagonistic to, those of the New Jersey Class. Plaintiff has retained counsel with substantial experience in the handling of wage-and-hour class actions in New Jersey and this District. Plaintiff and her counsel are committed to the vigorous prosecution of this action on behalf of the New Jersey Class and have the financial resources to do so. Neither Plaintiff nor counsel have any interests adverse to those of the New Jersey Class.

132. These questions of law and/or fact predominate over any questions affecting only individual New Jersey Class Members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, absent a class action, most New Jersey Class Members likely would find the cost of litigating their claims to be prohibitive and would have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

133. Class certification is appropriate because the prosecution of separate actions by individual New Jersey Class Members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for

Defendant, and because adjudications respecting individual New Jersey Class Members would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impeding their ability to protect their interests.

134. Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each New Jersey Class Member who has suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all New Jersey Class Members.

135. No unusual difficulties are likely to be encountered in the management of this action as a class action.

**COUNT I**
**Minimum Wage Violation of the FLSA**
**(On Behalf of Plaintiff and the FLSA Collective Members)**

136. All previous paragraphs are incorporated as though fully set forth herein.

137. The FLSA requires that covered non-exempt employees be compensated at the applicable federal minimum wage rate. *See* 29 U.S.C. § 206(a).

138. The FLSA defines "employer" broadly to include "any person acting

directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d).

139. Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d).

140. During all relevant times, Plaintiff and FLSA Collective Members have been covered employees entitled to the FLSA's protections. *See* 29 U.S.C. § 203(e).

141. Plaintiff and the FLSA Collective Members are not exempt from the requirements of the FLSA.

142. Plaintiff and FLSA Collective Members regularly work hours each workweek for which they do not receive minimum wages.

143. Defendant, pursuant to its policies and practices, failed and refused to pay minimum wages for all hours Plaintiff and FLSA Collective Members worked in a workweek during the relevant time period.

144. Defendant did not pay Plaintiff and the FLSA Collective Members at least 85% of the effective applicable minimum wage rate. 29 U.S.C. § 214(b)(3).

145. Defendant knowingly failed to properly compensate Plaintiff and the FLSA Collective Members' minimum wages in violation of 29 U.S.C. § 206.

146. In violating the FLSA, Defendant acted willfully and with reckless disregard of clearly applicable FLSA provisions.

147. Pursuant to 29 U.S.C. § 216(b), Defendant is liable to Plaintiff and the

FLSA Collective Members for unpaid minimum wages, plus an equal amount as liquidated damages, along with reasonable attorneys' fees and costs incurred in recovering the unpaid wages.

## COUNT II
### Overtime Violation of the FLSA
### (On Behalf of Plaintiff and the FLSA Collective Members)

148. All previous paragraphs are incorporated as though fully set forth herein.

149. The FLSA requires that covered non-exempt employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1½) times the regular rate at which they are employed. *See* 29 U.S.C. § 207.

150. The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d).

151. Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d).

152. During all relevant times, Plaintiff and FLSA Collective Members have been covered employees entitled to the FLSA's protections. *See* 29 U.S.C. § 203(e).

153. Plaintiff and the FLSA Collective Members are not exempt from the requirements of the FLSA.

154. In certain workweeks, Plaintiff and FLSA Collective Members work more than forty (40) hours per workweek.

155. Defendant, pursuant to its policies and practices, failed and refused to pay overtime wages for all hours Plaintiff and FLSA Collective Members worked in excess of forty (40) in a workweek during the relevant time period.

156. Defendant knowingly failed to properly compensate Plaintiff and the FLSA Collective Members' overtime wages for hours worked in excess of forty (40) in a workweek, in violation of 29 U.S.C. § 207.

157. In violating the FLSA, Defendant acted willfully and with reckless disregard of clearly applicable FLSA provisions.

158. Pursuant to 29 U.S.C. § 216(b), Defendant is liable to Plaintiff and the FLSA Collective Members for unpaid overtime compensation at a rate of one and one-half times their regular rates of pay, plus an equal amount as liquidated damages, along with reasonable attorneys' fees and costs incurred in recovering the unpaid wages.

## COUNT III
### Minimum Wage Violations of the New Jersey Wage and Hour Law
### (On Behalf of Plaintiff and the New Jersey Class)

159. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

160. Plaintiff brings her NJWHL claim on behalf of herself and the New

Jersey Class.

161. Defendant is an employer covered by the New Jersey Wage and Hour Law. N.J.S.A. § 34:11-56a(1)(g).

162. Plaintiff and all New Jersey Class Members are "employees" as defined by N.J.S.A. § 34:11-56a(1)(f) and (h).

163. Throughout the relevant period, Defendant has been subject to the NJWHL and its enabling Regulations.

164. Plaintiff and all New Jersey Class Members are entitled to minimum wages at the minimum wage rate specified by New Jersey law. N.J.S.A. § 34:11-56a4(a), (b)(3).

165. Plaintiff and all New Jersey Class Members do not qualify for any exemption from the minimum wage requirements of the NJWHL.

166. Defendant did not pay adequate wages to Plaintiff and the New Jersey Class Members.

167. Defendant did not pay Plaintiff and the New Jersey Class Members at least 85% of the effective applicable minimum wage rate. N.J.A.C. § 12:56-3.6.

168. The exact amount of minimum wage compensation that Defendant has failed to pay Plaintiff and the New Jersey Class Members is unknown at this time, as many of the records necessary to make such precise calculations are in the possession of Defendant, or were not kept by Defendant.

169. The NJWHL requires employers to make, keep, and preserve true and accurate records of each employee's hours worked and the wages paid to him. N.J.S.A. § 34:11-56(a)(20).

170. Plaintiff and the New Jersey Class are entitled to review Defendant's records to determine the exact amount of minimum wages owed by Defendant. Absent Defendant keeping these records as required by law, Plaintiff and the New Jersey Class are entitled to submit their information about the number of hours worked.

171. As a result of Defendant's willful and unlawful conduct, Plaintiff and the New Jersey Class are entitled to recover their unpaid minimum wages under the NJWHL, plus liquidated damages in an amount equal to 200% of their unpaid wages, as well as attorney's fees and costs. *See* N.J.S.A. § 34:11-56a25.

**COUNT IV**
**Overtime Violations of the New Jersey Wage and Hour Law**
**(On Behalf of Plaintiff and the New Jersey Class)**

172. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

173. Plaintiff brings her NJWHL claim on behalf of herself and the New Jersey Class.

174. Defendant is an employer covered by the New Jersey Wage and Hour Law ("NJWHL"), N.J.S.A. § 34:11-56a(1)(g).

175. Plaintiff and all New Jersey Class Members are "employees" as defined by N.J.S.A. § 34:11-56a(1)(f) and (h).

176. The overtime wages sought by this claim are "wages" as defined by N.J.S.A. § 34:11-56(a)(1)(d).

177. Throughout the relevant period, Defendant has been subject to the NJWHL and its enabling Regulations.

178. Plaintiff and all New Jersey Class Members are entitled to overtime compensation at a rate of one and one-half times their regular hourly rate for hours worked in excess of forty (40) hours per week pursuant to N.J.S.A. § 34:11-56a4(b).

179. Plaintiff and all New Jersey Class Members do not qualify for any exemption from the wage and overtime requirements of the NJWHL.

180. The exact amount of compensation, including overtime compensation, that Defendant has failed to pay Plaintiff and the New Jersey Class Members is unknown at this time, as many of the records necessary to make such precise calculations are in the possession of Defendant, or were not kept by Defendant.

181. The NJWHL requires employers to make, keep, and preserve records of the wages, hours, and other conditions and practices of employment, and to preserve such records. Plaintiff and the New Jersey Class are entitled to review Defendant's records to determine the exact amount of overtime wages owed by Defendant. Absent Defendant keeping these records as required by law, see N.J.S.A.

§ 34:11-56(a)(20), Plaintiff and the New Jersey Class are entitled to submit their information about the number of hours worked.

182. As a result of Defendant's willful and unlawful conduct, Plaintiff and the New Jersey Class are entitled to recover their unpaid overtime wages under the NJWHL in an amount equal to 1.5 times their regular rates of pay, plus liquidated damages in an amount equal to 200% of their unpaid wages, as well as attorney's fees and costs. *See* N.J.S.A. § 34:11-56a25.

**COUNT V**
**Violations of the New Jersey Wage Payment Law**
**(On Behalf of Plaintiff and the New Jersey Class)**

183. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

184. Plaintiff brings her NJWPL claim on behalf of herself and the New Jersey Class.

185. The conduct alleged herein violates the NJWPL (N.J.S.A. § 34:11-4.1, et seq.).

186. At all relevant times, Defendant was an "employer" within the meaning, and subject to the requirements, of the NJWPL. *See* N.J.S.A. § 34:11-4.1(a).

187. At all relevant times, Defendant employed Plaintiff and the New Jersey Class Members as covered "employees" within the meaning of the NJWPL. *See*

N.J.S.A. § 34:11-4.1(b).

188. The NJWPL requires employers, like Defendant, to pay employees, including Plaintiff and the New Jersey Class Members, "the full amount of wages due" to employees on their established and regular paydays. *See* N.J.S.A. § 34:11-4.2.

189. Defendant's bi-weekly $50 stipend and $45 break-duty day-rate constitute direct monetary "wages" within the meaning of the NJWPL, N.J.S.A. § 34:11-4.1(c), because Defendant promised those payments in a written Position Description and offer letter in advance of the work being performed and disbursed them on a recurring, established payroll schedule.

190. During the course of their employment, Defendant failed to pay Plaintiff and the New Jersey Class Members the full amount of wages due on regular paydays as required by the NJWPL. N.J.S.A. § 34:11-4.2.

191. Defendant violated, and is violating, the NJWPL by knowingly failing to pay Plaintiff and the New Jersey Class Members wages for all the hours of work they performed. *See* N.J.S.A. § 34:11-4.2.

192. Plaintiff and the New Jersey Class Members did not authorize Defendant to withhold their unpaid earned wages.

193. Any agreement between Defendant and Plaintiff or the New Jersey Class Members not to pay wages for the work performed would be null and void.

N.J.S.A. § 34:11-4.7.

194. Plaintiff's and the New Jersey Class Members' earned wages remain unpaid.

195. Defendant's unlawful conduct harmed Plaintiff and the New Jersey Class Members by depriving them of the earned wages they are owed.

196. Accordingly, Plaintiff and the New Jersey Class Members are entitled to recover their unpaid earned wages (at their agreed hourly rates), plus liquidated damages in an amount equal to 200% of their unpaid wages, as well as attorney's fees and costs. *See* N.J.S.A. § 34:11-4.10(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks the following relief on behalf of herself and the Classes:

a. An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

b. Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Collective Members;

c. An order certifying this action as a class action under Federal Rule of Civil Procedure 23(b)(3);

d. An order designating Plaintiff as the representative for the New Jersey Class and designating Plaintiff's counsel as counsel for the New Jersey Class;

e. Issuing proper notice to the New Jersey Class at Defendant's expense;

f. Back pay damages and prejudgment interest to the fullest extent permitted under the law;

g. Liquidated damages to the fullest extent permitted under the law;

h. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

i. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Date: August 13, 2026

Respectfully submitted,

*/s/ Camille Fundora Rodriguez*
Camille Fundora Rodriguez
Michael J. Anderson
Sarah Thompson*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-4679
crodriguez@bergermontague.com
manderson@bergermontague.com
sthompson@bergermontague.com

Alexandra K. Piazza
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel.: (215) 875-3063
apiazza@bergermontague.com

*Attorneys for Plaintiff and the Proposed Class and Collective Members*

**Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was caused to be served by CM/ECF to the parties registered to the Court's CM/ECF system on August 13, 2026.

*s/ Camille Fundora Rodriguez*
Camille Fundora Rodriguez